**Ralph J. GALLIANO, et al., Appellants,**

v.

**UNITED STATES POSTAL SERVICE.**

No. 86–5684.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 28, 1987.

Decided Jan. 8, 1988.

MacKenzie Canter III, with whom Mark J. Diskin, Washington, D.C., was on brief, for appellants.

Sandra C. McFeeley, Atty., U.S. Postal Service, with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, Michael J. Ryan and Bradley L. Kelly, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Lawrence M. Noble, Gen. Counsel, Richard B. Bader, Asst. Gen. Counsel, Jonathan A. Bernstein, Atty., Fed. Election Com'n, Washington, D.C., on the brief for amicus curiae urging reversal.

Before RUTH BADER GINSBURG and WILLIAMS, Circuit Judges, AUBREY E. ROBINSON, Jr.*, Chief Judge, U.S. District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

This case presents an issue of first impression concerning the regulation of solicitations for political contributions: Do the prescriptions of the Federal Election Campaign Act (FECA or Act)—in particular, those on name identifications and disclaimers contained in 2 U.S.C. §§ 432(e)(4) and 441d(a)—displace *pro tanto* application of the postal fraud proscriptions contained in 39 U.S.C. § 3005 to mail solicitations for funds to support political action? Parties charged with violating the postal fraud proscriptions, and the Federal Election Commission (FEC or Commission), as amicus curiae, are ranged on one side of the question; the United States Postal Service stands on the other side. We hold that

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

FECA does qualify or control in part the operation of the postal fraud measure. Accordingly, we reverse the judgment of the district court, 669 F.Supp. 488 dismissing the action, and return the case to the district court with instructions to remand the matter to the Postal Service for reconsideration of its decision in light of this opinion.

I.

The Congressional Majority Committee (CMC) is an independent political action committee; founded in 1980, the organization maintains its offices in Arlington, Virginia. CMC raises money through political appeals and independently decides how to spend the funds it solicits in furtherance of its projects; it contributes no money directly to the candidates it supports, or to their authorized campaign committee. Ralph J. Galliano is the chairman of CMC.

In September 1983, CMC decided to urge the election of then Representative Phil Gramm as United States Senator for Texas. CMC therefore set up, as its independent project, Americans for Phil Gramm in '84 (APG). Between November 1983 and April 1984, CMC mailed, in three batches, over 200,000 solicitations for contributions to APG.

The APG solicitations featured a six-page letter. The letterhead displayed in large print, "Americans for Phil Gramm in '84," followed in the next two lines by the statement, in small print, "an independent project of the Congressional Majority Committee" and, in the same small print, CMC's address and telephone number in Arlington. In the body of the letter, CMC was described as "an independent conservative political action committee." "Ralph J. Galliano, Chairman, Americans for Phil Gramm in '84," identified the letter signer. Flyers accompanying each mailing stated that in 1982 CMC had "raised and contributed well over one-half million dollars to candidates nationwide." Joint Appendix (J.A.) at 55–67 (first mailing); J.A. at 68–80 (second mailing); Administrative Record (A.R.) at 340–52 (third mailing). The second and third mailings, but not the first mailing, included, in small print at the bottom of the first page of the solicitation letter, this disclaimer: "Not authorized by any candidate or candidate's committee." J.A. at 68 (second mailing); A.R. at 340 (third mailing). All three mailings enclosed a pre-paid envelope addressed to APG, c/o CMC, in Arlington, Va. No mailing mentioned Gramm's official campaign committee, Friends of Phil Gramm (FPG).

Representative Gramm learned of the APG appeals and became concerned that those solicitations were misleading potential supporters and diverting contributions away from his campaign. FPG, Gramm's only authorized campaign committee, took legal action on three fronts. First, in November 1983, Gramm filed an administrative complaint with the FEC alleging that Galliano, CMC, and APG had violated 2 U.S.C. §§ 432(e)(4), 441d(a)(3) (1982) and 11 C.F.R. § 110.11(a)(1)(iii) (1983). These provisions require a political committee not authorized by any candidate to refrain from including the name of any candidate in its name and to state clearly in its political communications both the name of the person or group who paid for the communication and the fact that the communication is not authorized by any candidate.[1] After

---

**1.** 2 U.S.C. § 432(e)(4) (1982) provides, in relevant part:

In the case of any political committee which is not an authorized committee, such political committee shall not include the name of any candidate in its name.

2 U.S.C. § 441d(a) (1982) provides:

Whenever any person makes an expenditure for the purpose of financing communications expressly advocating the election or defeat of a clearly identified candidate, or solicits any contribution through any broadcasting station, newspaper, magazine, outdoor advertising facility, direct mailing, or any other type of general public political advertising, such communication—

. . . .

(3) if not authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state the name of the person who paid for the communication and state that the communication is not authorized by any candidate or candidate's committee.

11 C.F.R. § 110.11(a)(1) (1987) provides:

[W]henever any person makes an expenditure for the purpose of financing a communication that expressly advocates the election or defeat

investigating Gramm's complaint, the FEC's General Counsel recommended only one adverse action; he proposed that the Commission find probable cause to believe a violation of section 441d(a)(3) had occurred because the first (November 1983) APG mailing had failed to state clearly that the solicitation was not authorized by any candidate or candidate's committee. The Commission approved its General Counsel's recommendation and entered into a conciliation agreement with CMC pursuant to 2 U.S.C. § 437g(a)(4)(A) (1982).[2] *See In re Congressional Majority Committee*, M.U.R. (Matter Under Review) 1603 (July 8, 1985), *reprinted in* Brief for the FEC, Amicus Curiae, as Attachment 3.

Second, in April 1984, FPG sued APG, CMC, and Galliano in the United States District Court for the Eastern District of Virginia alleging jurisdiction based on diversity of citizenship and asserting state law claims for fraud and the unauthorized use of Gramm's name for advertising or commercial purposes. The court denied FPG's plea for preliminary injunctive relief.

The state law claim based on APG's use of Phil Gramm's name in its title, the court ruled, could not stand, because FECA, specifically, 2 U.S.C. § 432(c)(4) (1982), provided the exclusive regulatory regime for that matter. On the fraud charge, the court thought that the precise disclaimer prescriptions of FECA, 2 U.S.C. § 441d(a)(3) (1982), might preempt part of the state law claim. In any event, the court found, FPG had not adduced facts at the evidentiary hearing adequate to demonstrate the intent to deceive that is, under state law, an essential element of a fraud claim. *Friends of Phil Gramm v. Americans for Phil Gramm in '84*, 587 F.Supp. 769 (E.D.Va. 1984). No appeal was taken.

Third, some time before filing the diversity action in federal court, Gramm notified the General Counsel of the U.S. Postal Service of APG's solicitations. On March 15, 1984, the General Counsel, pursuant to 39 C.F.R. § 952.5 (1983),[3] filed an administrative complaint against Galliano, APG, and CMC, appellants here (hereafter re-

of a clearly identified candidate, or that solicits any contribution, through any broadcasting station, newspaper, magazine, outdoor advertising facility, poster, yard sign, direct mailing or any other form of general public political advertising, a disclaimer meeting the requirements of 11 C.F.R. 110.11(a)(1)(i), (ii), (iii) or (iv) shall appear and be presented in a clear and conspicuous manner to give the reader, observer or listener adequate notice of the identity of persons who paid for and, where required, who authorized the communication. Such person is not required to place the disclaimer on the front face or page of any such material, as long as a disclaimer appears within the communication, except on communications such as billboards, that contain only a front face.

. . . .

(iii) Such communication, including any solicitation, if made on behalf of or in opposition to a candidate, but paid for by any other person and not authorized by a candidate, authorized committee of a candidate or its agent, shall clearly state that the communication has been paid for by such person and is not authorized by any candidate or candidate's committee.

The language of 2 U.S.C. §§ 432(e)(4), 441d(a) (1982) and 11 C.F.R. § 110.11(a)(1) (1987) has remained constant throughout the history of this case.

Under the FEC's current interpretation, section 432(e)(4) prohibits only the use of a candidate's name in the formal name of a political committee unauthorized by a candidate, for example, the Congressional Majority Committee, and not in a project name, such as Americans for Phil Gramm in '84. This interpretation is *sub judice* before this court in an appeal from *Common Cause v. FEC*, 655 F.Supp. 619 (D.D.C. 1986). Our decision in this case regarding the impact of FECA on 39 U.S.C. § 3005 (1982) will be unaffected by the outcome of that case. Whatever the correct interpretation of section 432(e)(4), we hold that it and section 441d(a)(3) operate to prevent the Postal Service from proceeding under 39 U.S.C. § 3005 (1982) against APG based on the Service's assessment of the misrepresentational nature of APG's name and the inefficacy of the APG mailings' disclaimers.

**2.** 2 U.S.C. § 437g (1982) requires the FEC to attempt to resolve violations of FECA through conciliation. If conciliation fails, the FEC may not itself impose sanctions upon a FECA violator; it may, however, bring a civil suit to enforce the law in federal district court. *See* 2 U.S.C. § 437g(a)(6)(A) (1982).

**3.** The language of 11 C.F.R. § 952.5 at the time the General Counsel filed the administrative complaint was not materially different from current language of that regulation. *Compare* 11 C.F.R. § 952.5 (1983) *with* 11 C.F.R. § 952.5 (1987).

ferred to collectively as APG); the complaint charged that the APG solicitations were unlawful under 39 U.S.C. § 3005 (1982), a measure initially enacted in 1872, which proscribes "scheme[s] or device[s] for obtaining money ... through the mail by means of false representations...."[4] In particular, the Service charged that APG's mailings had conveyed "directly or indirectly" the following false representations:

a) Respondents [Galliano, APG, and CMC] are authorized by Congressman Phil Gramm to solicit and collect funds for his campaign to be elected to the United States Senate;

b) Contributors to Respondents may reasonably expect that Congressman Phil Gramm or his authorized campaign committee will receive the money that is sent to Respondents; and

c) In 1982 Congressional Majority Committee raised and contributed well over one-half million dollars to candidates nationwide.

*In re Galliano*, P.S. Docket No. 19/15 at 2 (May 2, 1985), *reprinted in* J.A. at 25, quoting Complaint of U.S. Postal Service (March 15, 1984).

After a hearing, the Administrative Law Judge (ALJ) found that APG had made the representations charged in the administrative complaint, and that the representations were both material and false; accordingly, the ALJ concluded that APG had violated

section 3005. *In re Galliano*, P.S. Docket No. 19/15 (June 13, 1984) (Initial Decision). APG appealed and thereafter filed a motion to dismiss the entire Postal Service proceedings because of a settlement APG had reached with FPG, in view of which FPG had no objection to the requested dismissal. The Judicial Officer of the Postal Service denied the motion to dismiss, reasoning that "other members of the public still need[ed] the protections [of section 3005]." *See* J.A. at 26–27.

Based principally on an assessment of the misrepresentational nature of APG's name and disclaimers, the Judicial Officer affirmed the ALJ's decision and issued two remedial orders standard under the statute: one order required the postmaster at Arlington, Va. to stop most mail addressed to APG, permit inspection of the stopped mail by APG, and return to the sender any mail containing responses to the APG solicitations; the other ordered APG to cease and desist from falsely representing that it was authorized by Gramm to solicit contributions, or that the contributions would go directly to the Gramm campaign, and from misrepresenting the nature of its past fundraising efforts. *In re Galliano*, P.S. Docket No. 19/15 (May 2, 1985) (Postal Service Decision), *reprinted in* J.A. at 24–42. No participant in these proceedings is aware of any prior case applying section 3005 to solicitations for political contributions. *See* Brief for the FEC, Amicus Curi-

---

**4.** Section 3005(a) reads in full:

Upon evidence satisfactory to the Postal Service that any person is engaged in conducting a scheme or device for obtaining money or property through the mail by means of false representations, including the mailing of matter which is nonmailable under section 3001(d) of this title, or is engaged in conducting a lottery, gift enterprise, or scheme for the distribution of money or of real or personal property, by lottery, chance, or drawing of any kind, the Postal Service may issue an order which—

(1) directs the postmaster of the post office at which mail arrives, addressed to such a person or to his representative, to return such mail to the sender appropriately marked as in violation of this section, if the person, or his representative, is first notified and given reasonable opportunity to be present at the re-

ceiving post office to survey the mail before the postmaster returns the mail to the sender;

(2) forbids the payment by a postmaster to the person or his representative of any money order or postal note drawn to the order of either and provides for the return to the remitter of the sum named in the money order or postal note; and

(3) requires the person or his representative to cease and desist from engaging in any such scheme, device, lottery, or gift enterprise.

For purposes of the preceding sentence, the mailing of matter which is nonmailable under such section 3001(d) by any person shall constitute prima facie evidence that such person is engaged in conducting a scheme or device for obtaining money or property through the mail by false representations.

ae, at 11.[5]

On August 7, 1985, APG commenced the instant action seeking judicial review of the Postal Service decision. APG urged, centrally, that in the context of solicitations for political contributions, the Postal Service either cannot regulate speech at all, or cannot do so without first obtaining a judicial determination that the speech at issue is unprotected by the first amendment.

On cross-motions for summary judgment, the district court ruled in favor of the Postal Service and dismissed the action. The court held that, without offense to the first amendment, the Postal Service could determine, in the first instance, whether a mail solicitation for political contributions made false representations in order to obtain money. *Galliano v. United States Postal Service*, 669 F.Supp. 488 (D.D.C. 1986).

■ Following the September 28, 1987 oral argument on APG's appeal to this court, we directed the parties and invited the FEC to submit briefs addressing the following question:

> Bearing in mind the first amendment concerns implicated, should the prescriptions of the Federal Election Campaign Act, particularly those contained in 2 U.S.C. §§ 432(e)(4), 441d(a), be deemed to occupy the field and to displace pro tanto the application of 39 U.S.C. § 3005 to mailings of the kind at issue in this case?

Order filed October 28, 1987. After considering the briefs filed in response by APG, the FEC, and the Postal Service, we hold that the Postal Service, in its enforcement of 39 U.S.C. § 3005, may not impose constraints upon the names or disclaimers of organizations mailing solicitations for political contributions beyond those imposed by FECA.

## II.

Regarding the tension between the general false representation provisions of 39 U.S.C. § 3005 (1982) and the specific disclosure requirements of 2 U.S.C. §§ 432(e)(4), 441d(a)(3) (1982), the participants in this appeal invoke familiar principles of statutory interpretation. Appellants and their amicus, the FEC, emphasize that "a precisely drawn, detailed statute pre-empts more general remedies." *Brown v. General Servs. Admin.*, 425 U.S. 820, 834, 96 S.Ct. 1961, 1968, 48 L.Ed.2d 402 (1976). *See also Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976), quoting *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974) ("When there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."). The Postal Service, on the other hand, stresses that "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. at 551, 94 S.Ct. at 2483. *See also Pennsylvania v. ICC*, 561 F.2d 278, 292 (D.C.Cir.1977) ("It is well established that when two regulatory systems are applicable to a certain subject matter, they are to be reconciled and, to the extent possible, both given effect."). We set out first each side's elaborations upon these basic themes, and then explain how we believe the statutes are best reconciled.

The overarching consideration, according to appellants and the FEC, is the context in which each statute came into being. Section 3005 originated well over a century ago; as the Postal Service itself observes, it is one of the oldest federal consumer protection statutes, and it is notable for the

5. At the September 28, 1987 oral argument of this appeal, the following exchange occurred:
Court: We're told this is a case of first impression and it was triggered by Congressman Gramm's complaint. Have there been other similar incidents since then?
Counsel for United States Postal Service: Since then, no, your Honor.

Court: This is one-of-a-kind, then?
Counsel for United States Postal Service: It's one-of-a-kind. It's the first one that has come before a federal court on the issue of political speech.

breadth and generality of its language. *See* Brief for Appellee at 12. Nothing in the legislative history of section 3005 indicates that Congress ever adverted to the potential application of the measure to political solicitations of the kind involved here, and the special problems such applications might entail. By contrast, the name identification and disclaimer provisions of FECA, 2 U.S.C. §§ 432(e)(4), 441d(a)(3) (1982), were framed with the particular problems Congress identified in political solicitations in clear focus, and with first amendment concerns in plain view. *See* Brief for the FEC, Amicus Curiae, at 10–11.

FECA, appellants and the FEC emphasize, establishes a comprehensive regime of limitations on campaign contributions and expenditures and extensive disclosure requirements including sections 432(e)(4) and 441d(a)(3); it is thus precisely the kind of detailed statute whose specific provisions control matters that might otherwise fall under the total governance of a more broadly conceived and crafted statute. *See, e.g., National Republican Congressional Comm. v. Legi–Tech Corp.*, 795 F.2d 190, 192 (D.C.Cir.1986) ("[T]he provisions of the Copyright Act ... dealing with compilations generally, must be construed in a manner that will accommodate [FECA]."). Part of the design of FECA, appellants and the Commission strenuously urge, is to place responsibility for the civil enforcement of matters specifically covered by the Act exclusively in the hands of the FEC in the first instance.[6]

Consistent with this view of FECA's and the FEC's province, 2 U.S.C. § 437c(b)(1) (1982) provides:

> The Commission shall administer, seek to obtain compliance with, and formulate policy with respect to, this Act and chapter 95 and chapter 96 of Title 26. The Commission shall have exclusive jurisdiction with respect to the civil enforcement of such provisions.

This section, distinct from 2 U.S.C. § 437d(e) (1982) which curtails private rights of action under FECA, "was enacted by Congress to make clear that only the FEC, and no other *governmental* authority, would have jurisdiction to enforce" the civil provisions of FECA. *Democratic Party v. National Conservative Political Action Comm.*, 578 F.Supp. 797, 806 (E.D. Pa.1983) (3–judge panel) (emphasis in original; discussing legislative history), *aff'd in part, rev'd in part sub nom. FEC v. National Conservative Political Action Comm.*, 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). *See also FEC v. National Conservative Political Action Comm.*, 470 U.S. at 489, 105 S.Ct. at 1465 ("We do not necessarily reject the District Court's conclusion that the legislative history of the successive amendments to § 437c(b)(1) indicates an intention by the word 'exclusive' to centralize in one agency the civil enforcement responsibilities previously fragmented among various governmental agencies."); 470 U.S. at 505, 105 S.Ct. at 1473 (White, J., dissenting) ("[T]he reference to 'exclusive' jurisdiction [in section 437c(b)(1)] was designed to centralize all *governmental* enforcement authority in the FEC.") (emphasis in original; citing H.R. REP. No. 917, 94th Cong., 2d Sess. 3–4, *reprinted in* FEDERAL ELECTION COMMISSION, LEGISLATIVE HISTORY OF FEDERAL ELECTION CAMPAIGN ACT AMENDMENTS OF 1976, at 803–04 (1977)); *McNamara v. Johnston*, 522 F.2d 1157, 1162 n. 5 (7th Cir.1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976), quoting 120 CONG.REC. 35,134 (1974) (FECA "provides that all civil complaints predicated upon or pertaining in any manner to titles I and III of the act ... shall be channeled to the Commission.... The delicately balanced scheme of procedures and remedies set out in the act is intended to be the exclusive means for vindicating the rights and declaring the duties stated therein.") (statement of Rep. Hays, Chairman of House conferees to 1974 FECA Amendments creating the FEC).

*International Union of Operating Engineers, Local 701*, 638 F.2d 1161 (9th Cir.1979), *cert. denied*, 444 U.S. 1077, 100 S.Ct. 1026, 62 L.Ed.2d 760 (1980).

---

6. It is settled that criminal enforcement of FECA provisions may originate either with the FEC, *see* 2 U.S.C. § 437g(a)(5)(C) (1982) or the Department of Justice. *See United States v.*

In sum, appellants and the FEC reach this conclusion from the context, structure, specificity, and legislative history of FECA: where FECA sets specific requirements for the content of political communications, as it does in the case of the names and disclaimers of unauthorized political committees, no other agency may proceed against such a committee on the basis of that agency's assessment of the misrepresentational nature of those names or disclaimers.

In opposition to any FECA-inspired shrinkage of its domain, the Postal Service cites a string of cases holding that "the same issues and parties may be proceeded against simultaneously by more than one agency." *Warner–Lambert Co. v. FTC,* 361 F.Supp. 948 (D.D.C.1973). The cases featured by the Postal Service, although they differ significantly from the instant case as to the facts and the agencies involved, illustrate a reality of which we are fully cognizant. As this court has remarked: "[T]his is an era of overlapping agency jurisdiction under different statutory mandates." *FTC v. Texaco, Inc.,* 555 F.2d 862, 881 (D.C.Cir.) (en banc), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977). In such an era "a court should approach gingerly a claim that one agency has conclusively determined an issue later analyzed from another perspective by an agency with different substantive jurisdiction." *Id. See, e.g., FTC v. Cement Inst.,* 333 U.S. 683, 689–93, 68 S.Ct. 793, 797–99, 92 L.Ed. 1010 (1948) (concurrent Federal Trade Commission/Department of Justice jurisdiction approved); *Thompson Medical Co. v. FTC,* 791 F.2d 189, 192–93 (D.C.Cir.1986) (concurrent Federal Trade Commission/Food and Drug Administration jurisdiction approved), *cert. denied,* —— U.S. ——, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987); *Bristol–Meyers Co. v. FTC,* 738 F.2d 554, 559 (2d Cir.1984) (same); *Pennsylvania v. ICC,* 561 F.2d 278, 292 (D.C.Cir.1977) (concurrent Interstate Commerce Commission/Federal Maritime Commission jurisdiction approved); *Friedlander v. United States Postal Service,* 658 F.Supp. 95, 103 (D.D.C.1987) (concurrent FDA/FTC/U.S. Postal Service jurisdiction approved).

Based on this array of authority, the Postal Service maintains that it may find a solicitation for political contributions to be a false representation under 39 U.S.C. § 3005 (1982) even if the FEC finds the solicitation to have met the requirements of 2 U.S.C. §§ 432(c)(4), 441d(a)(3) (1982). The Postal Service takes this position without qualification. The Service sees no need to accommodate or adjust to any FECA prescription or FEC ruling. It may proceed under section 3005, the Service believes, totally on the basis of its own assessment of a mailing like APG's, and may find fraudulent name identifications and disclaimers that meet FECA standards. Any other approach, the Postal Service concludes, would constitute a partial repeal of section 3005 by implication. Because repeals by implication are strongly disfavored, *see Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976), the Postal Service asserts that appellants' and the FEC's position cannot be credited.

■ In arriving at our disposition of this case in light of the initial and supplemental briefing, *see supra* p. 1367, we are mindful that the Postal Service's application of section 3005 to solicitations for political contributions poses genuine constitutional questions. *See Blount v. Rizzi,* 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971) (need for judicial determination whether allegedly obscene mailing was unprotected expression); *Lebron v. WMATA,* 749 F.2d 893 (D.C.Cir.1984) (need for judicial determination whether distinctively political message was false, unprotected expression). Our resolution reconciles the two statutes in a manner that reduces constitutional doubt. *See NLRB v. Catholic Bishop,* 440 U.S. 490, 500–01, 99 S.Ct. 1313, 1318–19, 59 L.Ed.2d 533 (1979) (construing National Labor Relations Act to avoid first amendment questions); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932) (construing Longshoremen's and Harbor Workers' Compensation Act to avoid fifth amendment questions); *EEOC v. Pacific Press Publishing Assoc.,* 676 F.2d 1272, 1276 (9th Cir.1982) (construing Title VII to

avoid first amendment questions). We hold that the FEC is the exclusive administrative arbiter of questions concerning the name identifications and disclaimers of organizations soliciting political contributions. As to representations not specifically regulated by FECA, however—for example, CMC's allegedly false statement that in 1982 it raised and contributed over half a million dollars to candidates nationwide—nothing in or about the Act limits the 39 U.S.C. § 3005 enforcement authority of the Postal Service.[7]

■ To permit the Postal Service to base findings of false representation on a political action committee's name and disclaimers that are consistent with FECA requirements would defeat the substantive objective of that Act's first-amendment-sensitive provisions. *See* H.R. REP. No. 917, 94th Cong., 2d Sess. 5, *reprinted in* FEDERAL ELECTION COMMISSION, LEGISLATIVE HISTORY OF FEDERAL ELECTION CAMPAIGN ACT AMENDMENTS OF 1976, at 805 (1977) (provisions for direct notice of sponsorship adequately inform the public "while safeguarding the full enjoyment of the First Amendment rights of individuals and groups to make expenditures for political expression"); *see generally Buckley v. Valeo*, 424 U.S. 1, 64–68, 96 S.Ct. 612, 656–58, 46 L.Ed.2d 659 (1976) (applying strict first amendment scrutiny to disclosure requirements of FECA). A fine balance of interests was deliberately struck by Congress in the name and disclaimer requirements of FECA. Those provisions, we think it fair to infer, represent more than a minimal requirement that the Postal Service is free to supplement. Rather, we believe they were meant to provide a safe haven to candidates and political organizations with respect to those organizations' names and sponsorship. If FECA requirements are met, then as we comprehend that legislation, no further constraints on names and disclaimers may be imposed by other governmental authorities.

FECA's first-amendment-sensitive regime includes a procedural as well as a substantive component. When a candidate or political organization is alleged to have violated the name or disclaimer provisions of FECA, the allegations will be assessed according to FECA procedures. Those procedures require that informal conciliation efforts between an alleged FECA violator and the FEC occur before any formal civil enforcement action is taken. 2 U.S.C. § 437g(a)(4) (1982). If conciliation fails, the FEC may not itself impose sanctions; it must institute a civil action in a federal district court in order to obtain relief. 2 U.S.C. § 437g(a)(6) (1982). Thus, even if the Postal Service were to apply the substantive standards of FECA in determining whether the name or disclaimers of an organization soliciting political contributions constituted a false representation for purposes of section 3005, there would be a gap. The Postal Service's procedures, which include neither conciliation nor judicial imposition of sanctions, would not measure up to the first-amendment-prompted arrangements Congress devised for FECA enforcement actions.

We thus conclude that the Postal Service's no-repeal-by-implication argument, *see supra* pp. 1369–1370, is properly turned around. Assume that a political action committee employs name identifications

---

7. We take no position on the constitutional issues that originally divided the parties to this appeal: (1) may solicitations for political contributions be regulated under 39 U.S.C. § 3005 (1982); (2) if so, then as a matter of first amendment due process, *see* Monaghan, "First Amendment 'Due Process,'" 83 HARV.L.REV. 518 (1970), may such solicitations be regulated under section 3005 without a prior judicial determination of the existence *vel non* of first amendment protections. *Cf. Blount v. Rizzi*, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971) (need for judicial determination whether allegedly obscene mailing was unprotected expres-

sion). We are returning this case to the district court with instructions that it remand the matter to the Postal Service for a determination whether the Service will proceed against appellants under section 3005 solely on the basis of the statement concerning CMC's 1982 fundraising efforts. Any constitutional inquiry on our part, therefore, would be premature. Should the Postal Service decide to proceed against appellants on remand and should appellants choose to challenge that process, the time will be ripe to treat the potential constitutional dimension of this case.

and disclaimers lawful under FECA. Were the Postal Service to find the representations false under section 3005 based on its own assessment of the public's perception, the Service's adjudication—both substantively and procedurally—would effectively countermand the "precisely drawn, detailed" prescriptions of FECA.

 Nevertheless, we do not hold that solicitations for political contributions are entirely immune from Postal Service scrutiny under section 3005.[8] Apart from the name of a political organization and the presence or absence of a sponsorship disclaimer, much may appear in a solicitation for political contributions that could materially deceive readers and thereby constitute a false representation under section 3005. An organization's false claims regarding its past fundraising success conceivably could fit that bill. No provisions of FECA set standards for such representations and there is no reason to believe that the silence of that legislation was meant to exempt uncovered statements from all regulation. Congress' intent, expressed in section 3005, was broadly to protect the public from fraud. We cannot conclude that Congress meant to leave unregulated misrepresentations that it may constitutionally regulate merely because the false statements are made in an endeavor to extract political contributions.

CONCLUSION

The Postal Service in this case based its decision on the cumulative impact of APG's name, disclaimers (or the absence or inadequacy thereof), and representations concerning prior fundraising efforts. Our decision, which reverses the district court's judgment, rules out Service consideration of the first two charges in the Service's complaint. *See supra* p. 1366. For the reasons stated, we return the case to the district court with instructions to reinstate the complaint and remand the matter to the Postal Service for reconsideration of its decision in light of this opinion.

*Reversed and remanded.*

---

8. The Postal Service mistakenly attributes this extreme view of FECA's preemptive strike to the FEC. *See* Supplemental Brief for United States Postal Service at 2. As we read the FEC's amicus brief, the Commission takes the narrower view that we adopt here. *See* Brief for the FEC, Amicus Curiae, at 13–14. A similar view is reflected in *Friends of Phil Gramm v. Americans for Phil Gramm,* 587 F.Supp. 769 (E.D.Va.1984).