**UNITED STATES of America, Appellant/Cross–Appellee,**

v.

**Maria HSIA, Appellee/Cross–Appellant.**

Nos. 98–3114, 98–3125.

United States Court of Appeals, District of Columbia Circuit.

Argued March 15, 1999.

Decided May 18, 1999.

**520**

Elizabeth D. Collery, Attorney, U.S. Department of Justice, argued the cause for appellant/cross-appellee. With her on the briefs was Eric L. Yaffe, Trial Attorney.

Nancy Luque and Rangeley Wallace argued the cause and filed the briefs for appellee/cross-appellant.

Reid H. Weingarten, William T. Hassler and Brian M. Heberlig were on the brief for amicus curiae Yah Lin Trie.

Before: WILLIAMS, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Concurring opinion filed by Circuit Judge ROGERS.

STEPHEN F. WILLIAMS, Circuit Judge:

A six-count indictment charged Maria Hsia with various offenses deriving from a scheme to solicit illegal political contributions and disguise them as lawful ones. Hsia filed numerous motions to dismiss. The district court denied the motions as to Count One—conspiracy to defraud the Federal Election Commission ("FEC") and the Immigration and Naturalization Service ("INS")—but dismissed Counts Two through Six—causing false statements to be made to FEC. 24 F.Supp.2d 33, 38–47, 52–63 (D.D.C.1998); 24 F.Supp.2d 63, 64–65 (D.D.C.1998). The United States appeals this dismissal; we reverse. Hsia cross-appeals the refusal to dismiss Count One; we dismiss the appeal for lack of appellate jurisdiction.

\* \* \*

The International Buddhist Progress Society ("IBPS"), one of Hsia's alleged co-conspirators and operator of the Hsi Lai Temple in Hacienda Heights, California, is a tax-exempt religious organization incorporated in California. The Federal Election Campaign Act ("FECA") forbids such a corporation from making contributions in federal election campaigns, 2 U.S.C. § 441b(a); the tax code bars participation in political campaigns whether they are federal or not, 26 U.S.C. § 501(b)(3).

Hsia herself is an immigration consultant in the Los Angeles area. The indict-

ment alleges a series of actions taken by her and her co-conspirators to funnel money from IBPS through straw contributors into various campaigns. Hsia would either find and solicit individuals to serve as nominal contributors, see Indictment ¶¶ 32, 35, 38, 40(hh), 40(ii), or ask IBPS to do so, see *id.* ¶¶ 17, 19, 23, 26, 28, 33, 35, 40(h), 40(k), 40(n), 40(q), 40(t), 40(z), 40(cc), 40(gg). (She sometimes employed herself as such a contributor. See *id.* ¶¶ 15, 30, 38, 40(jj).) When IBPS complied with such a request—often employing people associated with the Temple as nominal contributors, see *id.* ¶ 13(b)—Hsia sometimes forwarded the checks to the campaign. See *id.* ¶¶ 23, 33, 38, 40(kk). All nominal contributors, whether solicited by Hsia or by IBPS, were reimbursed in full by IBPS from its corporate funds. See *id.* ¶¶ 17, 19, 23, 24, 26, 28, 30, 32, 33, 35, 39, 40(g), 40(i), 40(*l*), 40(*o*), 40(r), 40(u), 40(x), 40(aa), 40(dd), 40(*ll*). The individuals thus simply served as conduits for IBPS's money.

Hsia also allegedly used conduits to funnel money from two of her immigration clients—Hsieh San Yeh and Zhe Xu[1]—to the Clinton/Gore '96 Primary Committee, Inc. ("Clinton/Gore '96"). In these instances she instructed others to solicit the straw donors but conveyed the checks to the committee herself. See Indictment ¶¶ 47–49; Bill of Particulars at 14–16.

Count One charges that the actions involving IBPS constituted a conspiracy to defraud the United States, specifically the FEC and INS, in violation of 18 U.S.C. § 371. See Indictment ¶ 10. Counts Two through Six charge that Hsia, by means of her conduit contribution schemes, willfully caused certain recipients of such contributions—Clinton/Gore '96, the Democratic National Committee, and The Friends of Patrick J. Kennedy '96—to make false statements to the FEC in violation of 18 U.S.C. §§ 2 and 1001: these recipients filed reports listing the conduit contributions as being from their nominal sources, although the true source was either IBPS, Mr. Yeh, or Ms. Xu. See Indictment ¶¶ 43, 46, 49, 52, 55; Bill of Particulars at 14–16.

\* \* \*

Counts Two through Six are based on 18 U.S.C. §§ 2(b), 1001(a):

Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2(b).

[W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

. . .

(2) makes any materially false, fictitious, or fraudulent statement or representation . . .

shall be fined under this title or imprisoned not more than 5 years, or both. *Id.* § 1001(a).[2]

The most orderly fashion for addressing the district court's decision is by the elements of willfulness, causation, and falseness, with respect to all of which it found deficiencies.

"Willfully"

■ According to the district court, the word "willfully" in § 2(b) requires the government to show that Hsia knew that her conduct was unlawful. 24 F.Supp.2d at 62

---

1. Ms. Xu was apparently a foreign national barred from making contributions by 2 U.S.C. § 441e.

2. This is the current form of § 1001, which applies only to Count Six. Counts Two through Five, alleging acts occurring before this current language went into effect, charge violations of the previous version of § 1001. That stated: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully . . . makes any false, fictitious or fraudulent statements or representations . . . shall be fined under this title or imprisoned not more than five years, or both." The differences between the versions are not relevant to this case, and we will refer to the current § 1001.

n. 32; 24 F.Supp.2d 14, 21 (D.D.C.1998) (original decision on this issue); see also *United States v. Trie*, 21 F.Supp.2d 7, 14–16 (D.D.C.1998).[3] Believing that the charges here required an unconventional and extreme interpretation of §§ 2(b) and 1001, the court found that Hsia could not have known that her conduct would fall within their grasp.

Although we find no material novelty in the government's reading of the statutes (see below), our decision on whether the element of willfulness is adequately alleged does not turn on this point. We believe that the government need not prove that Hsia knew her acts to be unlawful; the question whether she could in fact have had such knowledge is therefore irrelevant.

■ The natural reading of §§ 2(b) and 1001 is this: the government may show mens rea simply by proof (1) that the defendant knew that the statements to be made were false (the mens rea for the underlying offense—§ 1001) and (2) that the defendant intentionally caused such statements to be made by another (the additional mens rea for § 2(b)). See *United States v. Gabriel*, 125 F.3d 89, 101 (2d Cir.1997). The district court, like the Third Circuit in *United States v. Curran*, 20 F.3d 560 (3d Cir.1994), relied on *Ratzlaf v. United States*, 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), for its contrary result. But this extends *Ratzlaf* too far: that case did not universalize a broad reading of "willfully" and thus overturn the general rule that ignorance of the law is no excuse. *Ratzlaf* found a knowledge-of-criminality requirement in a statute that independently required the act at issue to be "for the purpose of evading" various reporting requirements; reading "willfully violating" there as only requiring intention would have made it surplusage. *Id.* at

139–41. In this case, no such problem exists. We find *Ratzlaf*'s narrow exception inapplicable and adopt the natural reading of mens rea above. Accordingly, nothing in the indictment's allegations contradicts the government's capacity to prove the statutorily required mens rea.

"Causes"

■ It is not entirely clear what defects the district court found in the government's theory of causation. The initial objection—that "a check is not a statement," 24 F.Supp.2d at 62–63—appears not only incorrect (the cases indicate, at most, that a check does not assert that it will not bounce) but irrelevant. The false statements here are the political committees' reports identifying certain listed names as sources of specific contributions; the names on the checks, together with the rest of the alleged conduit contribution scheme, could have "caused" these false statements to be made whether or not the checks were themselves statements of anything. But the district court seems also to have had a more general objection—that the causal link between Hsia's conduct and the making of false statements was too "attenuated." *Id.* at 61–62.

■ Section 2(b) does not, of course, limit by its terms the particular means by which the defendant may "cause" another to commit the act, nor the degree of permissible "attenuation" between these two people's actions. Cf., e.g., *United States v. West Indies Transp., Inc.*, 127 F.3d 299, 307 (3d Cir.1997) (defendant may be prosecuted under §§ 2(b) and 1001 even if people who actually made false statements are not criminally liable). The mens rea element of the statute provides an outer limit on the latter, for a weak or implausible causal link would make it more difficult to

---

**3.** Although the district judge appeared to attribute this knowledge-of-criminality requirement to § 1001's "knowingly and willfully" language, it must, if it exists at all, be a gloss of "willfully" in § 2(b): no court adopting such a requirement has questioned the rule

that knowledge of criminality need not be shown in direct § 1001 prosecutions. See *United States v. Curran*, 20 F.3d 560, 567–68 (3d Cir.1994) (analyzing issue as § 2(b) requirement).

prove that the defendant brought the effect about "willfully."

Nor is the general scheme of the indictment novel; the application of § 2(b) to a conduit contribution scheme has been several times upheld. See *Curran,* 20 F.3d 560; *United States v. Hopkins,* 916 F.2d 207 (5th Cir.1990); *Goland v. United States,* 903 F.2d 1247 (9th Cir.1990); cf. *United States v. Yermian,* 468 U.S. 63, 68–75, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984) (§ 1001 conviction requires no proof that defendant was aware of any federal agency jurisdiction). In those cases, defendants were convicted under §§ 2(b) and 1001 for employing such a scheme to conceal their own contributions: they had found nominal donors, had these conduits make payments to a committee, and reimbursed them. Here, the money was not Hsia's; it belonged instead to her immigration clients or to her co-conspirator IBPS. But Hsia arranged—directly or indirectly—for the conduits to do their part. That she did this to channel *others'* money does not help her. As FEC regulations direct committees to report "any contribution made by check, money order, or other written instrument" "as a contribution by the last person signing the instrument" "[a]bsent evidence to the contrary," 11 CFR § 104.8(c), the simple interposition of conduits to sign the checks is certainly enough to "cause" a committee to make false statements in its report. The indictment and bill of particulars straightforwardly lay out the government's account of Hsia's affirmative steps toward that result.

■ Invocation of the due process clause or the First Amendment does not change the analysis, at least for review of the indictment. As the case fits comfortably within the clear and previously accepted scope of §§ 2(b) and 1001, there is no question of notice or vagueness. As for overbreadth, we do not understand how it might apply here. There is no suggestion that the statutes are facially invalid. While the absence of any claim that Hsia's activity was itself constitutionally protect-

ed is consonant with the general form of overbreadth standing, see *Board of Trustees v. Fox,* 492 U.S. 469, 484, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), neither Hsia nor the district court ever specified just what protected activity could be chilled by the application of §§ 2(b) and 1001 to this case. "Overbreadth" appears, at bottom, to have been another tag for the court's concern that the indictment stretched §§ 2(b) and 1001 unreasonably far. We see no constitutional difficulty in use of the statutes against the conduct alleged here.

"False"

■ The final strand of the district court's reasoning was its suggestion that the statements at issue were "literally true." 24 F.Supp.2d 33, 58.

FECA requires that political committees file periodic reports containing, among other things,

> the identification of each—
>
> > (A) person ... who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year ... together with the date and amount of any such contribution.

2 U.S.C. § 434(b)(3). "Contribution" is defined, in relevant part, as

> any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office.

*Id.* § 431(8)(A)(i). FECA also provides that

> For purposes of the limitations [on contributions and expenditures] imposed by this section, all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as con-

tributions from such person to such candidate. The intermediary or conduit shall report the original source and the intended recipient of such contribution to the Commission and to the intended recipient.

*Id.* § 441a(a)(8). Finally, FECA specifically states:

No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person.

*Id.* § 441f.

We are convinced by these latter provisions that § 434(b)(3)'s demand for identification of the "person ... who makes a contribution" is *not* a demand for a report on the person in whose name money is given; it refers to the true source of the money. As the committees here did not report the true sources, their statements would appear to be false.

■ The district court, for the most part, appears to have agreed with this analysis. See 24 F.Supp.2d at 59–60. It determined, however, that FECA's safe harbor provision, 2 U.S.C. § 432(i), controlled the case. That subsection, added five years after FECA's original enactment, states:

When the treasurer of a political committee shows that best efforts have been used to obtain, maintain, and submit the information required by this Act for the political committee, any report or any records of such committee shall be considered in compliance with this Act.

*Id.* Because the indictment does not allege that the committee treasurers had any wrongful knowledge, the district court found, the statements in the reports must be considered FECA-compliant (and therefore not false). 24 F.Supp.2d at 60–61.

The argument assumes that this safe harbor does not merely provide an affir-

mative defense for the committee and its officers but actually modifies the substantive reporting requirements of FECA. Even if the provision wrought some substantive amendment, however, it could not be so drastic as to aid Hsia here. Section 432(i) conditions its relief on the treasurer's making "best efforts" to ascertain the necessary information, and FEC has spelled such efforts out in 11 CFR § 104.7. But not even Hsia argues that the section would shield a treasurer who went through the motions of the "best efforts" and then submitted information contrary to facts known to her. Thus, if the act of filing the report with conduits listed as contributors were "directly performed by" Hsia, 18 U.S.C. § 2(b), her actual knowledge of falsity—required to be shown anyway— would make the statements culpable regardless of any ritualistic performance of "best efforts."

In any event, we find no substantive modification. The statute allows the safe harbor only when the treasurer "shows" the use of best efforts, suggesting that the provision only applies to a proceeding against the committee itself or one in a position to make such efforts on the committee's behalf. 2 U.S.C. § 432(i). Further, there remains no qualifying language in the actual reporting requirements, and indeed § 432(i) refers to "the information required by this Act." *Id.* Finally, it would make no sense for Congress to allow treasurers to rely on the provision of information by others while at the same time giving others a virtual carte blanche to provide inaccurate information. We believe § 432(i) does not benefit those not associated with the committee at issue.

■ On appeal, amicus Yah Lin ("Charlie") Trie presents an alternate theory of truth. Trie relies on the FEC forms themselves, claiming that they did not request identification of the actual source of the money. This argument might make some sense if the forms employed terms other than those of the statute itself, but

they do not. Schedule A—the list of names at issue—is simply an itemized list of "Contributions (other than loans) From [ ] Individuals/Persons Other Than Political Committees." This, like the rest of the form, simply echoes and implements the language of § 434(b)—a subsection which, as we have noted above, requires that the true source of money be reported.

We thus reject all arguments that the statements alleged in the indictment were "literally true."[4]

\* \* \*

Although Hsia conclusorily restates the theories adopted by the district court, most of her briefs are devoted to alternate theories for affirming the dismissal.

■■■ Hsia's initial claims are all of First Amendment protection. Her free exercise arguments (asserted on behalf of IBPS and its members) we can dismiss immediately: these are—at most—a basis for a defense at trial, not a legal deficiency in the indictment. Her free speech argument appears to be this: since Hsia was simply soliciting political contributions, her actions here were protected speech; therefore the indictment must be subject to strict scrutiny.

This misframes the issue. The only solicitations alleged are those of *conduit* contributions and of nominal "contributions" from the conduits themselves. Neither is protected. FECA's reporting requirements were upheld by the Supreme Court. See *Buckley v. Valeo*, 424 U.S. 1, 60–68, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Hsia has not suggested any plausible grounds for a right to tamper with these reports. Cf., e.g., *Goland*, 903 F.2d at 1258 (rejecting as frivolous defendant's asserted right to contribute anonymously via conduits).

■■ Finally, turning to Hsia's argument that FECA constitutes a pro tanto repeal of §§ 2 and 1001, we agree with the district court that it does not.

■■ We work in these cases under a presumption against repeal by implication. In *United States v. Hansen*, 772 F.2d 940 (D.C.Cir.1985), rejecting an argument that the financial disclosure requirements of the Ethics in Government Act effected a pro tanto repeal of § 1001, we said that the presumption rests on the view "that Congress legislate[s] with knowledge of former related statutes, ... and will expressly designate the provisions whose application it wishes to suspend, rather than leave that consequence to the uncertainties of implication compounded by the vagaries of judicial construction." *Id.* at 944–45 (internal quotation omitted). Thus we will not find repeal absent "clear and manifest" evidence that it was intended. *Id.* at 947–48.

Hsia presents no evidence of this sort. Instead, she relies on our decision in *Galliano v. United States Postal Service*, 836 F.2d 1362 (D.C.Cir.1988). There the Postal Service, exercising its administrative power under the general postal fraud provisions of 39 U.S.C. § 3005, had attacked as misleading the name and disclaimers on a solicitation for political contributions. To the extent FECA set out standards for these elements of such a solicitation, we held, it displaced the Service's authority under § 3005.

Hsia reads the case broadly, as indicating that FECA generally displaces more general statutes. Like the district court, we disagree. *Galliano* concerned the relative scope of jurisdiction for two administrative agencies—FEC and the Postal Service. The Department of Justice's authority to enforce general criminal statutes is quite different.[5]

---

4. We also reject Trie's contention, based on his same theory, that the counts must be dismissed because the FEC forms were "fundamentally ambiguous." Read in context, the forms have no such defect.

5. *Galliano* did not purport to disturb the long-recognized rule that the power of the Department to prosecute criminal violations is not displaced merely by the fact of a more focused later enactment, see *Hansen*, 772 F.2d at 945–46 (citing cases)—a corollary to the

Unlike the Postal Service, the Department of Justice has no authority to develop substantive standards of its own. As a criminal enforcer, it brings cases in federal court, where judges interpret the underlying statutes without deference. to the Department. See *Crandon v. United States,* 494 U.S. 152, 177–78, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (Scalia, J., concurring). There is, therefore, no risk that Congress might have empowered two bodies to promulgate conflicting substantive standards—a result that *Galliano* presumed Congress would seek to avoid. We thus rely on our general requirement of clear evidence and find no repeal.

\* \* \*

■ On both statutory and First Amendment grounds, Hsia cross-appeals the district court's refusal to dismiss Count One (conspiracy). On its face, of course, this refusal is plainly not a "final decision" over which 28 U.S.C. § 1291 gives us jurisdiction. Hsia nevertheless suggests two grounds for appellate jurisdiction: the collateral order doctrine and pendent appellate jurisdiction. We reject both.

■ To qualify as a final collateral order appealable under § 1291, the order at issue must, among other things, "be effectively unreviewable on appeal from a final judgment," *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)—that is, it must involve "an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." *United States v. MacDonald,* 435 U.S. 850, 860, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978). Hsia's asserted rights—principally free speech and free exercise—do not so qualify. Unlike congressional Speech or Debate immunity, see *Helstoski v. Meanor,* 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979), for example, they are not rights to avoid trial altogether. But see *United States v. P.H.E., Inc.,* 965 F.2d

848, 855 (10th Cir.1992) (finding that "unique confluence of factors" made First Amendment-based collateral appeal permissible). We apply the collateral order doctrine "with the utmost strictness in criminal cases," *Flanagan v. United States,* 465 U.S. 259, 265, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984); any rule allowing immediate appeals for defendants advancing some First Amendment reason why an indictment should be dismissed would expose a vast array of criminal trials to interruption.

■ Hsia alternatively asserts pendent jurisdiction. But in dictum in *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), the Supreme Court appeared to rule out such a theory:

> In determining that the courts of appeals may exercise jurisdiction over an appeal from a pretrial order denying a motion to dismiss an indictment on double jeopardy grounds, we, of course, do not hold that other claims contained in the motion to dismiss are immediately appealable as well.... [S]uch claims are appealable· if, and only if, they too fall within *Cohen's* collateral-order exception to the final-judgment rule. Any other rule would encourage criminal defendants to seek review of, or assert, frivolous double jeopardy claims in order to bring more serious, but otherwise nonappealable questions to the attention of the courts of appeals prior to conviction and sentence.

*Id.* at 662–63. Though the statement is only dictum, we think it right to take it literally, at least as to defendants' attempted appeals. Cf. *United States v. Zafiro,* 945 F.2d 881, 885 (7th Cir.1991) (suggesting that pendent appellate jurisdiction may allow government to challenge, at time of an interlocutory appeal authorized by § 3731, grant of severance to multiple defendants). An even partly open door could

---

rule that where various criminal prohibitions intersect, a prosecutor may choose among them, see *United States v. Batchelder,* 442 U.S.

114, 123–24, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).

enable defendants to achieve untoward delay by coupling extra claims with a weak interlocutory appeal, and thus would give them an incentive to raise weak claims before the trial court on issues allowing interlocutory appeals; even where the interlocutory appeal is brought by the government, as here, we see no reason to give the defendant a windfall opportunity to delay proceedings via cross-appeal.

\* \* \*

We reverse the district court's dismissal of Counts Two through Six, dismiss Hsia's cross-appeal for lack of jurisdiction, and remand the case for proceedings consistent with this opinion.

*So ordered.*

ROGERS, Circuit Judge, concurring:

I join the court in reversing dismissal of counts two through six, and remanding the case for trial. Our remand order means that any appellate disposition of count one could not resolve the entire case on appeal. Absent such an efficiency ground for review, or any other compelling reason to act now rather than after trial, there is no basis for exercising pendent appellate jurisdiction over Hsia's challenges to count one. The court therefore need not decide whether and under what conditions a court may exercise pendent jurisdiction over interlocutory appeals in criminal cases that may arise in the future. Consequently, the court's dictum purporting to bar such jurisdiction over claims raised by defendants is unnecessarily broad.

Hsia's pendent appellate jurisdiction claim would fail even under the standards applicable to civil cases. Addressing her challenges to count one now would not dispose of the case, *see Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1026–27 (D.C.Cir.1997), and there is nothing in the record to suggest that her cross-appeal is one of those "rare exceptions" where "substantial considerations of fairness or efficiency" justify exercising pendent jurisdiction. *Gilda*

*Marx, Inc. v. Wildwood Exercise, Inc.,* 85 F.3d 675, 678–79 (D.C.Cir.1996). Our remand of counts two through six demonstrates, moreover, that the issues on cross-appeal are not so "inextricably intertwined" with those of the jurisdictionally proper appeal that "review of the former ... [is] necessary to ensure meaningful review of the latter." *Swint v. Chambers County Com'n,* 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). In short, Hsia has not advanced a compelling reason to review count one before trial.

Hence, the court has no occasion to decide whether exercising pendent appellate jurisdiction over a criminal defendant's claim may in some circumstances be appropriate. Contrary to the court's suggestion, the Supreme Court has not foreclosed such jurisdiction. The court relies on dictum from *Abney v. United States,* 431 U.S. 651, 662–63, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), that it reads to hold by negative implication that pendent appellate jurisdiction is not available over claims by defendants in criminal cases. *See* opinion at 13. The Supreme Court's subsequent decision in *Swint* suggests a less rigid civil-criminal distinction than this court attempts to extract from *Abney.* First, the *Swint* Court did not characterize *Abney* as completely barring pendent appellate review in criminal cases, but rather as rejecting a rule "loosely allowing" such review. *See Swint,* 514 U.S. at 49–50. Second, in *Swint,* a civil case, the Court noted that *Abney's* reasoning applied in both civil and criminal contexts, but went on to permit at least some pendent jurisdiction in civil appeals. *See id.* This extension of *Abney* to the civil context does not automatically mean that *Swint* likewise extends to the criminal context, but suggests that the *Abney* dictum may not be a sturdy foundation upon which to base a categorical limit to this court's appellate jurisdiction.

All of the reasons offered by the court to deny pendent jurisdiction in criminal appeals would also justify withholding such review over claims raised by defendants in

civil appeals, *see* opinion at 13–14, and yet review is available in civil cases if certain strict standards are satisfied. *See, e.g., Swint,* 514 U.S. at 46–50; *Clinton v. Jones,* 520 U.S. 681, 707 n. 41, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); *Gilda Marx,* 85 F.3d at 678. While these standards may apply more stringently in criminal cases, *cf. United States v. Rostenkowski,* 59 F.3d 1291, 1301 (D.C.Cir.1995), it is not clear that criminal appeals are so fundamentally different from civil appeals that a safety-valve to the finality requirement applies in one but never in the other, nor that the asymmetric scheme posited by the court, categorically foreclosing review only of defendants' claims, even when the government has also filed an interlocutory appeal, *see* opinion at 526, necessarily follows.

Accordingly, I would dismiss Hsia's cross-appeal on the relatively narrow grounds discussed above, and leave broader questions for a case that actually raises them.