Michael R. GOLAND,
Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee,

and

Federal Election Commission,
Intervenor–Appellee.

No. 89–55422.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 12, 1989.

Decided May 21, 1990.

That provision also directs the district court immediately to certify all questions of constitutionality to the courts of appeals, sitting en banc. The district court found the constitutional challenge frivolous, dismissed the complaint, and refused to certify the constitutional claim to the en banc court. Goland appeals. We affirm.

## FEDERAL ELECTION CAMPAIGN ACT

In the aftermath of Watergate, Congress overhauled the Federal Election Campaign Act of 1971.[1] The 1974 amendments set various limits on the size of individuals' contributions to federal candidates, of expenditures by the candidates themselves, and of independent expenditures to promote a candidate.[2] The amendments further imposed strict recordkeeping and public reporting obligations, and created the Federal Election Commission (FEC or the Commission) to oversee and enforce the Act.

The constitutionality of this campaign reform legislation was immediately challenged, and in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) the Supreme Court upheld against first amendment attack the individual contribution limits and the recordkeeping and reporting requirements. Focusing on a distinction that has continued to evade many observers and some Justices, the Court, however, struck down the limitations on independent expenditures and candidate expenditures.[3]

The Court accepted the premise that limits on either contributions or independent expenditures place substantial and direct

Seth P. Waxman, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for plaintiff-appellant.

George B. Newhouse, Jr., Asst. U.S. Atty., Los Angeles, Cal., for defendant-appellee.

Janice P. Lacy, Federal Election Com'n, Washington, D.C., for intervenor-appellee.

Before CHOY, TANG and FLETCHER, Circuit Judges.

FLETCHER, Circuit Judge:

This case requires the court to apply the Federal Election Campaign Act (FECA or the Act) to a peculiar political imbroglio. Appellant Michael Goland was indicted for FECA violations stemming from his activities during the 1986 United States Senate election in California. In response he filed a civil suit challenging the constitutionality of certain provisions of the Act as applied to his alleged participation. Goland invoked a statutory provision unique to FECA that permits any individual eligible to vote for President to initiate an action to construe the constitutionality of the Act.

1. The Act as amended is codified at 2 U.S.C. § 431 *et seq.*

2. Corporate, bank, and labor campaign funding are regulated separately, 2 U.S.C. § 441b, as are contributions by government contractors, § 441c, and foreign nationals, § 441e.

3. Justice Marshall later came to agree with Justices Blackmun and White that there was no basis for distinguishing between expenditures and contributions. *FEC v. National Conservative PAC,* 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1984) (Marshall, J., dissenting).

*See* H. Leventhal, "Courts and Political Thickets," 77 *Col.L.R.* 345 (1977) for an excellent account of the judicial review of the 1974 amendments and the practical and theoretical effects of that review. As Judge Leventhal observed, "the ruling on the expenditure limit may have knocked out a central feature of a program dependent on a number of interrelated provisions. Its removal may devitalize and destablize this reform legislation. History is littered with instances when the collapse of reform measures was attributed to their inefficacy, though the real reason was inadequate implementation." *Id.* at 375–76.

limits on speech and association,[4] but distinguished the first amendment values implicated by each fiscal activity. The Court reasoned that

> a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing.

The Court opined that contribution limits imposed "little direct restraint" on political communication because the contributor remains still free to discuss candidates and issues. "While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor." *Id.* at 19–21. An independent expenditure, in contrast, was seen by the Court as a means of facilitating the spender's own political speech. The Court, therefore, viewed limitations on independent expenditures as directly restricting the degree to which the spender can speak autonomously.

The FEC and Congress advanced three governmental interests promoted by the contribution and expenditure limits: preventing corruption and the appearance of corruption, equalizing the relative ability of rich and poor to affect the outcome of elections, and braking the skyrocketing cost of political campaigns, thereby opening the political system more widely to candidates without access to large amounts of money. The Court found it unnecessary to look beyond the "primary" purpose of preventing corruption in order to uphold the limitation on individual *contributions*, but found this interest insufficient to justify the ceiling on *independent expenditures* because in the absence of coordination and prearrangement with the candidate, the danger of a *quid pro quo* exchange of money for improper commitments would be slight. The majority refused to find the other state interest—equalizing access to the political process—legitimate, let alone substantial.[5]

The Court was more expansive in its thinking regarding the purposes of FECA's reporting and disclosure requirements. Although sensitive to the dangers of compelled disclosure of political activity, the Court found that the governmental interests were of such magnitude that the requirements passed the strict test estab-

---

**4.** Or as Justice White phrased it, "Money talks." *Id.* at 262.

**5.** The Supreme Court, however, recently expanded its definition of corruption of the political system beyond the very literal sense of *quid pro;quo* corruption. In *Austin v. Michigan Chamber of Commerce,* — U.S. —, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), the Court upheld Michigan's Campaign Finance Act, which prohibits corporations from using general treasury funds for independent expenditures in state candidate elections. The Court recognized that the requirements burdened corporations' exercise of political expression, but found such restrictions justified by the compelling state interest in preventing corruption. Notably, the Court found that exercising an unfair advantage constitutes corruption of the system.

Although the Court adhered to the position it had stated in *Buckley,* that it is illegitimate for the state to try to equalize the relative influence of speakers, the Court observed that the political advantage of corporations is unfair because

> [t]he resources in the treasury of a business corporation ... are not an indication of popular support for the corporation's political ideas. They reflect instead the economically motivated decisions of investors and customers. The availability of these resources may make a corporation a formidable political presence, even though the power of the corporation may be no reflection of the power of its ideas. *Id.* at 1397, quoting *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 258, 107 S.Ct. 616, 628, 93 L.Ed.2d 539 (1986).

The Court concluded that one type of corruption that a legislature may seek to control is the "corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." *Austin,* at 1397.

lished by *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The Court accepted as substantial all three purposes behind the disclosure requirement: to provide the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office, to deter actual or apparent corruption, and to gather the data necessary to detect violations of the contribution limits. *Buckley*, 424 U.S. at 66–68, 96 S.Ct. and 657–658.

Under the current system of regulation of federal campaign financing, which was in effect during the 1986 Congressional elections, an individual may contribute no more than $1,000 to any one candidate, $5000 to a political action committee ("PAC"), and an aggregate of $20,000 to political committees of a national political party in any one election. 2 U.S.C. § 441a(a)(1). Contributions include payment for goods and services, including media advertisements. 2 U.S.C. §§ 431(8)(A), 441a(a)(7)(B) and 441a(a)(8).

A candidate's campaign committee must keep detailed records of its financial activities and file periodic reports with the FEC. Those reports are made available for public inspection. Specifically, the political committee must keep a record of the identity of each person who contributes more than $50 (2 U.S.C. § 432(c)(2)), and must disclose in reports filed with the FEC the identification of each person whose total contributions to the campaign exceed $200 within the calendar year (2 U.S.C. § 434(a) & (b)).

The Act prohibits the use of "conduits" to circumvent these restrictions: "No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person." 2 U.S.C. § 441f.

## FACTS

Alan Cranston (Democrat), Ed Zschau (Republican), and Ed Vallen (American Independent Party) ran in the 1986 California election for the United States Senate. The race between Cranston and Zschau was close, and pollsters predicted a narrow margin would decide the election. To help Cranston's odds, Goland decided to divert Republican votes from Zschau by giving a boost to the ultra-conservative Vallen.

Aware that Vallen would refuse to accept money from him if he knew Goland was the source, Goland devised a plan to fund television advertisements for Vallen without revealing the true source of the money. According to Goland's criminal indictment, the facts of which he does not dispute in this civil suit, Goland advanced $120,000 to a media company to produce advertisements for Vallen. (Vallen had raised only about $5000 up to this time.) Goland wrote the script advocating Vallen and criticizing Zschau, which Vallen read on the air.

The commercial began airing two weeks prior to election day. Sometime later but before the election, Vallen's campaign committee sought the identify of its benefactor. Presumably in order to avoid both FEC detection of the excessive contribution and Vallen's awareness of the true source of the funds, Goland arranged for 56 persons to make payments ranging from $1000 to $4500 to the media company with the understanding that Goland would reimburse them, which apparently he did.

The list of these 56 persons was then given to Vallen's campaign treasurer, who in turn reported them as the source of the advertising windfall in Vallen's report to the FEC.[6] The media company eventually

---

**6.** It is unclear how these contributions would appear legitimate to the FEC in light of the $1000 limit on individual contributions to candidates. The Second Superseding Indictment suggests that the contributions were made in such a way as to place them within the PAC provisions that allows higher individual contributions to a PAC. 2 U.S.C. § 441a(c). However, 2 U.S.C. § 441a(a)(2), imposes a $5000 limit on the amount a PAC may contribute to a candidate. Although *FEC v. National Conservative PAC,* 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) struck down the limits imposed on PAC *independent expenditure* on behalf of candidates who accept public financing under 26 U.S.C. § 9012(f), the *contribution* lim-

paid back the total $120,000 to Goland's corporation. Cranston won the election by a slim margin of about as many votes as Vallen received.[7]

On December 14, 1988, a federal grand jury in Los Angeles indicted Goland and three other individuals. The indictment specifically charged Goland with violating 18 U.S.C. § 1001 and 18 U.S.C. § 371[8] by knowingly and willfully causing the treasurer of the Vallen Campaign Committee to make false statements to the Commission for the purpose of concealing the fact that Goland had made a $120,000 contribution. The grand jury also charged Goland with making an excessive campaign contribution in violation of 2 U.S.C. § 441a, and making a contribution in the name of another in violation of 2 U.S.C. § 441f.

On March 13, 1989, Goland filed this civil complaint pursuant to 2 U.S.C. § 437h, seeking immediate certification by the district judge of three constitutional challenges to the application of the Act:

1. Whether the reporting and criminal provisions of FECA deny Goland his constitutional right under the First Amendment to contribute anonymously to the political campaign of a fringe third-party candidate in a manner that will keep the beneficiary candidate from knowing that the plaintiff has provided assistance to him.

2. Whether the maximum contribution and criminal provisions of FECA deny the plaintiff his First Amendment right to contribute anonymously to a fringe third-party candidate any amount he wishes to as long as measures are taken to prevent the beneficiary candidate from

learning the identity of the person who has provided assistance.

3. Whether Goland may constitutionally be prosecuted under FECA and 18 U.S.C. § 1001 for an attempt to pay anonymously for a television commercial supporting the candidacy of a fringe third-party candidate that cost more than the statutorily prescribed maximum contribution.

After conducting a non-evidentiary hearing, the district court dismissed the suit on the ground that *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612 controlled the case. The court, concluding that the constitutional claims were frivolous under *Buckley*, denied Goland's motion to certify the constitutional issues.[9] Goland immediately filed this appeal.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction of this appeal under 28 U.S.C. § 1291. The district court's May 1, 1989 order was final, and this appeal, filed on the same day, is timely.

■ In *Gifford v. Tiernan*, 670 F.2d 882, 885 (9th Cir.1982) we reviewed for abuse of discretion the dismissal of a complaint brought under 2 U.S.C. § 437h. *Gifford*, however, involved a *pro se* petitioner, and the court accordingly analyzed the case under the law of 28 U.S.C. § 1915(d) governing pro se appeals. We are confronted in this case with a question of law—whether the caselaw reviewing and interpreting Federal Election Campaign Act amendments disposes of this constitutional challenge. Accordingly, our review is *de novo*. *United States v. McConney*, 728 F.2d 1195 (1984).

its are still operative. Therefore, it remains unclear how even this scheme of hiding the source of the money would pass FEC muster.

7. According to the record, Cranston won the election with 3,636,672 votes. Zschau received 3,541,804, and Vallen 109,916.

8. These are general criminal statutes, making it illegal to conspire to defraud the United States or to cause false statements to any federal agency or department.

9. The district judge first verified that Goland's attorney did not wish to amend the complaint, and explicitly cleared the way for Goland to bring an immediate appeal of the order dismissing the complaint. "And it seems that the granting of the motion to dismiss would give you the same right to appeal to that very court that you want to go to on the certification, in any event." Of course, it is not really the same court: Goland seeks a review by the Court *en banc*, and urges this three-judge panel not to determine the ultimate merits of his constitutional challenges.

## DISCUSSION

The crux of Goland's argument that *Buckley* does not control is that *Buckley*'s constitutional analyses related only to contributors who want the candidate they support to know their identities, and dealt only with the obligation of a candidate to disclose information she or he is given voluntarily. Since Goland intended to keep his identity secret from even the candidate, the argument goes, *Buckley* does not apply.

Appellant is correct that this case involves a "unique set of facts" and is "unlike any other considered in the reported decisions of the federal courts." Even though the constitutional questions he presents in a sense are novel because of the unusual facts, they do not fall outside the principles established in the cases upholding FECA's contribution limits and disclosure requirements. Those cases lead ineluctably, although perhaps not swiftly, to the conclusion that the Act is constitutional as applied to Goland's activities.

The United States and Intervenor FEC, as a threshold matter, challenge Goland's standing to bring this constitutional challenge. Alternatively, they urge us to affirm the district court's dismissal of the suit as frivolous and its refusal to certify the constitutional challenges to our court for en banc review. They also argue that certification would be improper because Goland brings an applied rather than a facial challenge, because his challenges are hypothetical, and because he brings his challenge in a separate civil case while a criminal enforcement proceeding against him under the challenged statute is ongoing.

I. *Goland's Standing to Bring this Constitutional Challenge.*

▇ The Supreme Court observed that potential abuse of § 437h certification would be checked partly by the usual constitutional limitations on the jurisdiction of the federal courts: "[a] party seeking to invoke § 437h must have standing to raise the constitutional claim." *California Medical Association v. Federal Election Commission*, 453 U.S. 182, 193 n. 14, 101 S.Ct. 2712, 2720 n. 14, 69 L.Ed.2d 567 (1981) ("*CALMED*").

Because Goland used "conduits" to avoid detection of the true source of the contribution, the Commission characterizes Goland's acts as an effort to "circumvent" the law, rather than straightforwardly to "challenge" it. It argues that Goland lacks standing under *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), which held that one who is charged with conspiring to defraud the United States by trying to evade and circumvent a statutory scheme may not raise as a defense the unconstitutionality of that statute. According to the Commission, even if Goland obtained a favorable ruling in this civil case, it would not supply a valid defense to the criminal charges, and Goland thus fails to satisfy the "redressability" requirement for standing.

The government's argument is ingenious. However, ultimately it fails for several reasons. First, *Dennis* restricted the availability of certain defenses against *criminal* charges. The present case is *civil*—a declaratory judgment action under § 437h. *CALMED* established that *each* route for testing the constitutionality of a FECA provision (an enforcement action and a parallel declaratory judgment action) may be pursued independently. The fact that a criminal action is pending does not preclude civil proceedings. Therefore, what *might* be a bar to the assertion of a defense in the criminal case does not prevent an individual from pursuing his declaratory judgment suit. In fact, the proper forum for evaluating the effect, if any, of *Dennis* on Mr. Goland's criminal defense would seem to be the criminal proceeding. Some doubt exists as to the vitality of the *Dennis* rule, but we need not decide that here. This case is not like *Dennis*. The petitioners in *Dennis* were indicted for violating 18 U.S.C. § 371[10] by conspiring to obtain fraudulently NLRB services for the union by filing false "non-Communist" affidavits. They sought to have their convictions set

10. This statute prohibits conspiracies to defraud   the United States or any of its agencies.

aside on the ground that the law prohibiting Communist Party members from holding office in a labor union was unconstitutional. The Court held that "a claim of unconstitutionality will not be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit." *Id.* at 867, 86 S.Ct. at 1847. In other words, what the *Dennis* defendants were prosecuted for were their conspiratorial false statements to the government. Were Goland's crimes limited to charges of violating 18 U.S.C. § 1001 and 18 U.S.C. § 371 (statutes criminalizing conspiracies to defraud the government and causing false statements to the government) he could not collaterally raise the constitutionality of FECA. *Bryson v. United States*, 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969) (unconstitutionality of statute which required union officers to file non-communist affidavits is irrelevant to validity of conviction for filing false statement in violation of 18 U.S.C. § 1001); *United States v. Knox*, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969) (constitutionality of government's demand for information on wagering registration form is irrelevant to charge of filing false statements with government); *United States v. Mandujano*, 425 U.S. 564, 579, 96 S.Ct. 1768, 1778, 48 L.Ed.2d 212 (1976) (fifth amendment privilege against self-incrimination does not require suppression of false statement in perjury prosecution); *Rodriguez v. Seamans*, 463 F.2d 837 (D.C.Cir. 1972) (federal employee was subject to discharge for making false statements on security clearance application requiring information as to past Communist associations regardless of constitutionality of questions posed); *United States v. Sabatino*, 485 F.2d 540 (2d Cir.1973) (conviction for filing false statements to the government not subject to challenge on ground of unconstitutionality of the requirement).

This limitation on the capacity of a criminal defendant to challenge the constitutionality of a statute is sensible when so confined. If, for example, a local ordinance prevents picketing, and a picketer assaults an officer while being arrested, the unconstitutionality of the picketing ordinance should not be available as a defense to a charge of resisting arrest. Similarly, one may not be allowed to defend against a charge of lying to the government by claiming that one should not have been forced to divulge certain information. One should, however, be able to raise the unconstitutionality of the statute under which one is charged as a defense to a charge of having violated it. To continue the example, the picketer *would* be permitted to bring a constitutional challenge against the law that prohibits resisting arrest. This general principle has special force in the context of a first amendment challenge, where standing restrictions are relaxed in certain cases to avoid "chilling" protected expression. As Judge Wright observed in *Rodriguez*, ". . . if the First Amendment protected only the forthright, there would be no chilling effect doctrine." 463 F.2d at 852. And as Goland points out, one of the rights he seeks to vindicate is the ability to make anonymous donations. The very conduct that provides the factual basis for this challenge should not disqualify the challenge.

To the extent the government raises the bar of *Dennis* as affecting the redressability requirement, we note that *Dennis*, at most, might block Goland's standing to challenge the constitutionality of the Act in his defense of the 18 U.S.C. § 371 and § 1001 charges; arguably, even if he were to obtain a favorable ruling, that would not give him relief in the criminal action charging him with violations of those two statutes. Goland, however, also was charged with violating the substantive provision of FECA. Certainly he could challenge the constitutionality of the substantive FECA law he was charged with violating, no matter how he chose to violate it (i.e. by "circumvention" or by a straightforward refusal to follow its requirements). A successful constitutional challenge to FECA provisions would give at least partial redress to Goland.

Finally, to extend the *Dennis* rule to deny standing in a declaratory judgment action where Congress has accorded standing as broad as Article III would permit runs entirely counter to the pronounce-

ments of the Court in *CALMED*, 453 U.S. 182, 101 S.Ct. 2712. Noting that usual standing restraints would prevent overuse of § 437h, the Court specifically declined to limit declaratory judgment actions even where a speedy test of the constitutionality of a FECA provision was available in ongoing criminal proceedings. Although it is admittedly very untidy to have the same issue presented at the same time in two forums, the holding of the *CALMED* Court expressly permits it.

■ The United States and the Commission challenge Goland's standing on the additional ground that his claim involves a hypothetical application of FECA.[11] According to the Commission, although Goland purports to challenge the constitutionality of applying contribution limits to anonymous contributions, the indictment does not charge Goland with making an anonymous contribution, but rather with seeking to avoid detection of his excessive contribution by using "conduits" so that his contribution would be attributed to others. His contribution was not anonymous; it was secret. This logic is unpersuasive. Taking Goland at his word, he would not have used individuals as conduits if the law did not prohibit making anonymous contributions. Under FECA's reporting and disclosure requirements, to bypass the law in effect required violating it. We accept the well established limitation on federal court jurisdiction of refusing to anticipate constitutional questions. The questions posed by Appellant's suit however, are far from theoretical or hypothetical.

■ The government additionally argues that Goland's constitutional challenge is hypothetical because Goland does not admit that the allegations in the criminal indictment are true. There is no merit to this argument. If the complexity introduced by the possibility of concurrent civil and criminal proceedings is set aside for the moment, it becomes clear that Goland would not need to admit the factual allegations in the indictment (e.g., that it was he who

sent a check for $120,000) in order to challenge the constitutionality of the statute. In defending against a criminal enforcement action, Goland could *both* deny that he sent the check and argue that even if the court finds that he did send the check, he nonetheless should not be convicted because the statute is unconstitutional. Admitting for the sake of argument the truth of the government's factual allegations simply clears the way for asserting the affirmative defense of unconstitutionality. Goland does not have to wait until he has been found to have done the acts charged in the indictment to assert the affirmative defense of unconstitutionality.

The only difference in the present case is that Goland is asserting his second argument in the context of a civil suit. It may be awkward to have such simultaneous proceedings. But this is precisely what the Supreme Court found to be the statutory scheme. In *CALMED*, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) the Court was reviewing a Ninth Circuit opinion—an appeal from a civil suit. (As the Court noted, *in the meantime*, the district court entered a judgment against the defendants in the enforcement action. Thus, the procedural posture of *CALMED* was similar to *Goland*: the civil constitutional challenge was heard on appeal and decided before the enforcement action was resolved.) The Court rejected the Commission's standing challenge by noting that even if the PAC organizations did not have § 473h standing, the individual members of the PACs had "a sufficiently concrete stake in this controversy to establish standing to raise the constitutional claims at issue here." *CALMED* at 187, n. 6, 101 S.Ct. at 2717, n. 6. The Court went on to reject the Commission's other jurisdictional challenge— that civil constitutional challenges may not be maintained simultaneously with enforcement proceedings—with the following:

> Although Congress thus established two avenues for judicial review of constitutional questions arising under the Act, it

---

11. Their precise argument is that the court should not certify Goland's claims because they are hypothetical. However, if Goland's civil suit truly involved only a hypothetical application of FECA, he would lack standing altogether.

failed to provide any mechanism for coordinating cases in which the same constitutional issues are raised by the same parties in both a § 473h declaratory judgment action and a § 437g enforcement proceeding.... Although we agree with the Commission that the judicial review provisions of the Act are scarcely a blueprint for efficient litigation, we decline to construe § 473h in the manner suggested by the Commission.

Thus, in *CALMED* the Court held that FECA provides for constitutional challenges to be brought in *simultaneous* criminal and civil proceedings. There is nothing in this system of dual challenges that diminishes the otherwise available options for an individual who has been charged with violating a FECA provision. Indeed the dual system would be meaningless if the challenger in the civil proceeding had to stipulate to the truth of the factual allegations involved in the enforcement proceeding; if that requirement were imposed, there would never be any simultaneous criminal and civil FECA proceedings.

Finally, Goland does not have to be *convicted* of violating FECA in order to have a real and immediate stake in the determination of the constitutionality of the provisions he is charged with violating. Especially in light of the fact that FECA grants standing to persons who are *eligible voters*.[12] Goland has been indicted under FECA. His challenge is anything but hypothetical. He should not have to surrender his right to a trial in order to bring a simultaneous civil challenge, which the Supreme Court has found FECA provides.

We reject the contention that Goland lacks standing to bring this suit. Goland satisfies the traditional standing criteria: he has alleged an actual or threatened injury; that injury was caused by the challenged act; and that injury is apt to be redressed by a favorable decision. *See Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).[13]

## II. District Court's Refusal to Certify Appellant's Constitutional Questions.

### A. § 437h Certification.

■ When Congress passed comprehensive amendments to FECA in 1974, it also established a system for expedited review of any constitutional challenges. Section 437h provides in full:

> The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. *The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.* (emphasis added).

The legislative history of this unusual provision is thin. According to Justice O'Connor, when Senator Buckley introduced this amendment, he limited his explanation to the following comments:

> [I]t is a modification that I am sure will prove acceptable to the managers of the bill. It merely provides for the expeditious review of the constitutional questions I have raised. I am sure we will all agree that if, in fact, there is a serious question as to constitutionality of this legislation, it is in the interest of every-

---

12. The Court in *Buckley*, 424 U.S. 1, 96 S.Ct. 612, noted that Congress intended as expansive a definition of standing as Article III would allow.

13. For an example of a FECA challenge dismissed for lack of standing, see *Clark v. Valeo*, 559 F.2d 642 (D.C.Cir.1977). The court, sitting *en banc* pursuant to § 437h, held that Ramsey Clark's suit for declaratory and injunctive relief should be dismissed as unripe since he did not obtain his party's nomination and made no showing that his political activities as a voter were inhibited. Unlike Clark, who had no "ripe injury" or "personal stake" in the FECA provisions he challenged, Goland's indictment provides the necessary personal stake.

one to have the question determined by the Supreme Court at the earliest possible time.

*Bread Political Action Committee v. FEC,* 455 U.S. 577, 582, 102 S.Ct. 1235, 1238, 71 L.Ed.2d 432 (1981) (quoting 120 Cong.Rec. 10562, 1974).

Although the language of the statute requires the district court to certify *all* constitutional questions, courts have held that this mandatory phrasing should not be read to require them automatically to certify every constitutional question to an en banc court of appeals. In *CALMED,* 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1980), the Court explained in a footnote that it did not construe § 437h "to require certification of constitutional claims that are frivolous ... or that involve purely hypothetical applications of the statute ... or in cases where the resolution of such questions required a fully developed factual record." *Id.* at 193–94, n. 14, 101 S.Ct. at 2720, n. 14.[14]

The District Court was acting within its discretion when it refused to certify the case once it found the constitutional questions frivolous; the issue we face is whether the court properly concluded that the constitutional questions were frivolous. "Frivolous" is not a transparent or unproblematic concept as applied in this context. Once a core provision of FECA has been reviewed and approved by the courts, unanticipated variations also may deserve the full attention of the appellate court. At the same time, not every sophistic twist that arguably presents a "new" question should be certified. Once the statute has been thoroughly reviewed by the Court, questions arising under "blessed" provisions understandably should meet a higher threshold.

There have been few reported decisions that dismissed FECA challenges on the ground that they were frivolous. Although no courts explicitly have addressed the issue, determining what constitutes a frivolous question for the purposes of § 437h certification should not necessarily be the same as what constitutes a frivolous question, for example, for Rule 11 or perhaps even for 28 U.S.C. § 1915(d) purposes.[15] For obvious reasons, the court should have a higher threshold for a "frivolous" finding in the latter two contexts than in the case where the issue is certification to an en banc appellate court. Further, as the Court observed in *CALMED,* 453 U.S. 182, 193, n. 13, 101 S.Ct. 2712, 2720, n. 13, "the Federal Election Campaign Act is not an unlimited fountain of constitutional questions, and it is thus reasonable to assume that resort to § 437h will decrease in the future." The time may come when all provisions of the Act will have been reviewed for facial constitutionality—the apparent impetus for the expedited judicial review provision. An "as applied" challenge by a party whose acts fall within one of the already approved provisions may not merit consideration by the full appellate court, yet certainly should not necessarily subject the pleader to Rule 11 sanctions.

Two courts have viewed the district court's role in a § 437h case as similar to that of a single judge presented with a motion to convene a three judge court to hear constitutional challenges. *Mott v. FEC,* 494 F.Supp. 131 (D.D.C.1980); *Clark v. Valeo,* 559 F.2d 642 (D.C.Cir.), *aff'd* 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267 (1977). Under that standard, a single judge could dismiss constitutional claims which already had been decided. We believe this is a more appropriate standard. Such a standard may more closely resemble that applied under Rule 12(b)(6) to the

---

**14.** *CALMED* affirmed the Ninth Circuit holding that the $5000 limitation on contributions by individuals and unincorporated associations to PAC's is constitutional. The Ninth Circuit refused to base its decision to hear the case en banc on the § 437h provision, and instead rested its decision on Fed.R.App.P. 35. 641 F.2d 619 (1980).

**15.** In affirming a district court's refusal to certify a challenge it found to be frivolous under the § 1915(d) standard governing pro se petitions, the Ninth Circuit concluded that dismissals as frivolous pursuant to that statute are analogous, but not identical to dismissals for lack of a substantial federal question. *Gifford v. Tiernan,* 670 F.2d 882 (1982).

failure to state a claim than it does the frivolousness standard under § 1915(d). *See Neitzke v. Williams,* —— U.S. ——, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (holding that a complaint filed pro se is not automatically frivolous within the meaning of § 1915(d) because it fails to state a claim). A complaint is frivolous where none of the legal points are arguable on their merits. *Id.* 109 S.Ct. at 1831. Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive rule of law. "Nothing in Rule 12(b)(6) confines its sweep to claims of law which are obviously insupportable. On the contrary, if as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,' [citation omitted], a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Id.* at 1832. We conclude that at least where the legal issue has been resolved by the Supreme Court, the district court need not certify the constitutional challenge.

### B. Goland's Constitutional Challenges

Goland argues that the reporting and disclosure requirements and the contribution limits cannot be applied constitutionally to his role in the Vallen campaign because they would violate his first amendment right "to contribute anonymously in any amount to a minor-party candidate." Although his argument that *Buckley* does not dispose of this claim is creative, ultimately it fails. Simply put, Goland does not have such a first amendment right. The Supreme Court specifically upheld the Act's $1000 contribution limit, which Goland has been charged with violating. As the Commission comments, since Goland is unable to dispute this, he argues instead that when it upheld that limit, the Court did not have in mind contributions in which the contributor's identity is withheld from the candidate, at least when the recipient is

a minor candidate. As even Goland concedes, however, FECA prohibits anonymous contributions. *Buckley* upheld that limitation. *Buckley* upheld the reporting and disclosure requirements, even as applied to most minor party candidates. Goland's contribution in an amount over the limits is not lawful simply because his contribution was anonymous. The issues Goland raises were resolved by the Court in *Buckley,* and no feature of his admittedly distinctive factual situation distinguishes his case.

### 1. *Contribution Limit.*

■ Goland claims that the reasoning the Court followed in *Buckley* to uphold the contribution limits does not apply in his case. Goland asserts that in upholding contribution limits, the only state interest the Court would recognize was the prevention of *quid pro quo* corruption or the appearance of corruption. According to Goland, if his identity were kept secret from even the candidate, there would be no possible opportunity for exacting a *quid pro quo* deal or in any way influencing the candidate. Further, if a candidate has no chance of winning an election, he could not be in a position to exchange official favors for money. Therefore, no compelling state interest exists to justify the infringement on his political activity.

This argument ultimately fails for several reasons.[16] First, *Buckley* approved the application of contribution limits to minor party candidates as well as to candidates who are likely to win. *Id.* at 30–31, 96 S.Ct. at 640–641. Second, simply withholding one's identity does not eliminate the opportunity for securing some sort of exchange with the recipient, a point also illustrated by this case. Goland did not simply make a gift to Vallen of $120,000 to use as he wished. On the contrary, a deal was negotiated. Vallen received the money and in return read a script which actually was written by Goland in order indirectly to

**16.** Appellants advanced a similar argument in *CALMED,* 453 U.S. at 195, 101 S.Ct. at 2721, and the Court similarly rejected it.

promote Cranston.[17] Certainly then, neither the possibility nor the appearance of corruption was eliminated either; the public could never be sure that the candidate in fact is unaware of the identity of large "anonymous" donors. As the Commission points out, even if a donor's name is not directly communicated to the candidate, there are indirect ways of ensuring that the candidate is aware of the identity of the benefactor, or at least of the special interest he represents. Third, even if the donor genuinely desires to keep his identity secret, there is no assurance he will succeed as is evident from the happenings in this case. Finally, even if it were theoretically possible to devise a system to seal hermetically a donation so as to keep its source truly secret forever, thereby making the state interest in preventing corruption inapplicable to anonymous donations, Goland's position is still untenable. Even truly anonymous donations over $10 are prohibited. *Buckley* affirmed FECA's disclosure and reporting requirements, which serve the independent goal of providing voters with information regarding the source of candidates' support.

## 2. *Reporting and Disclosure Requirements.*

█ Goland argues that the reporting and disclosure requirements as they relate to anonymous contributions to a minor party candidate are unconstitutional on their face and as applied to him. Goland bases his claim on the historic constitutional protection given to anonymous political speech and association. Beginning with *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2

L.Ed.2d 1488 (1958), the judiciary recognized the importance of protecting anonymous political activity. The courts have repeatedly reaffirmed that the Constitution protects against compelled disclosure of political associations and beliefs. *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Bates v. Little Rock*, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). This protection is necessary to preserve individual liberties, to increase the dissemination of diverse viewpoints, and to promote the structural goal of wide political participation.[18] As our court has observed:

> The right of those expressing political, religious, social or economic views to maintain their anonymity is historic, fundamental, and all too often necessary. The advocacy of unpopular causes may lead to reprisals—not only by government, but by employers, colleagues, or society in general. While many who express their views may be willing to accept these consequences, others not so brave or not so free to do so will be discouraged from engaging in public advocacy.

*Rosen v. Port of Portland*, 641 F.2d 1243, 1251 (9th Cir.1981) (granting Jews for Jesus declaratory and injunctive relief by finding unconstitutional an ordinance requiring advance registration by those desiring to pamphlet airport terminal). In *Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), the Court established the basic rule that whenever identification and fear of reprisal would deter speech, the

---

**17.** One irony of this case is that *Buckley*'s expenditure-contribution distinction rested on the belief that expenditures involve the spender's own speech, while contributions do not. In this case, however, Goland made a contribution rather than an expenditure, but it was actually Goland's words that Vallen read.

**18.** *See, e.g., Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1975) (striking down for vagueness a municipal ordinance which required advance written notice be given to the local police department of any person desiring to canvass, solicit or call from house to

house for a charitable cause or political campaign. "The oppressive financial burden of campaigns makes reliance on volunteers absolutely essential, and in light of the enormous significance of citizen participation to the preservation and strength of the democratic ideal, absolutely desirable, indeed indispensable. Offensive to the sensibilities of private citizens, identification requirements such as the Oradell ordinance, even in their least intrusive form, must discourage that participation." *Id.* at 628, 96 S.Ct. at 1764 (Brennan, J., concurring in part)).

first amendment protects anonymity.[19]

Goland, however, cannot avail himself of this protection. The Supreme Court in *Buckley* carefully considered the danger posed by compelled disclosure. It held that the state interests promoted by FECA's reporting and disclosure requirements justified the indirect burden imposed on first amendment interests. Simply put, the Court carved out a narrow exception to the line of cases Goland relies on, and that exception encompasses Goland's activities.

Goland makes much of the fact that the contribution he sought to make anonymously was to a minor party candidate. He is correct that the protection against compelled disclosure often is needed in the context of participation in third party politics, obviously because it is that participation that incites government and social disapprobation. However, the *Buckley* Court specifically addressed this issue. The Court refused to grant a blanket exemption to minor parties, but recognized an exception for those parties that could show a "reasonable probability" that disclosures would subject their contributors to "threats, harassment, or reprisals." *Id.* at 74, 96 S.Ct. at 661.[20] Subsequently, the Court applied the *Buckley* test to find that the Socialist Workers Party provided sufficient evidence of private and governmental hostility to party members and supporters to justify exempting the party from Ohio's

reporting requirement. *Brown v. Socialist Workers '74 Campaign Commn.*, 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982). In *Federal Election Comm'n v. Hall–Tyner Election Campaign Comm.*, 678 F.2d 416 (1982), the Second Circuit similarly found that undisputed evidence established a reasonable probability of reprisal against contributors to the Communist Party candidates. Goland cites these cases, but they do not help his cause. In both *Brown* and *Hall–Tyner*, petitioners satisfied the *Buckley* requirement of providing evidence of probable harassment. Goland, in contrast, does not even attempt to make such a showing.[21]

Goland was not promoting a reviled cause or candidate. Goland did not fear government or private harassment; the only "chill" he feared was rejection by the recipient himself. As one district court noted recently, "[N]o judicially cognizable injury arises under those [First and Fourteenth] amendments from a candidate's rejection of the associational advances of an unwanted political suitor. Forced political association simply is not a 'right' protected under the Constitution...." *Coalition for a Progressive New York v. Colon*, 722 F.Supp. 990, 993 (S.D.N.Y.1989).

Finally, Goland argues that the substantial state interests that the *Buckley* Court found to justify the disclosure require-

**19.** Petitioners sought to distribute handbills that stated "I believe that every man should have an equal opportunity for employment no matter what his race, religion, or place of birth," and urged readers to help the organization carry on a boycott against merchants who carried products of manufacturers "who will not offer equal employment opportunities to Negroes, Mexicans, and Orientals." The Supreme Court declared unconstitutional an ordinance that prohibited the distribution of pamphlets unless they contained the names of the persons who prepared, distributed, and sponsored them.

**20.** The Court reasoned that the governmental interest in disclosure is diminished in the case of minor party candidates, while at the same time the threat posed to first amendment interests is substantially greater. *Id.* at 68–71, 96 S.Ct. at 658–60.

**21.** Other political speech cases decided after *Buckley* demonstrate the judiciary's continued

sensitivity to the special role played by anonymous political speech and the special needs of the speakers. Again, although Goland relies on these cases, they are inapposite. In *Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976), *Rosen v. Port of Portland*, 641 F.2d 1243 (9th Cir.1981), and *Wilson v. Stocker*, 819 F.2d 943 (10th Cir.1987), the Courts rejected local governments' claims that *Buckley* should be read to validate laws prohibiting anonymous distribution of campaign literature or other political or religious speech. In each case, the court found *Buckley*'s approval of compelled disclosure of the source of *financial contributions* to be distinct from requiring the disclosure of the source of *speech.* As Goland concedes, the political contributor does not stand in the same shoes as a pamphleteer or orator disseminating his own political views. *See* Blum, The Divisible First Amendment: A Critical Functionalist Approach to Freedom of Speech and Electoral Campaign Spending, 58 N.Y.U.L.Rev. 1273 (1983).

ments do not apply to anonymous donations made to a candidate with whom the donor disagrees. Goland is wrong. One major purpose behind the disclosure provision is to deter or expose corruption, "and therefore to minimize the influence that unaccountable interest groups and individuals can have on elected federal officials." *FEC v. Furgatch,* 807 F.2d 857 (9th Cir. 1987). Goland argues that when donations are anonymous there is no opportunity for corruption, but as our earlier discussion indicates, politics are not so simple.

A second Congressional goal furthered by disclosure and reporting was to keep the electorate fully informed of the sources of campaign funding and how the candidate spends the money. Goland refers to the *Buckley* Court's explanation that disclosure "allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interest to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office." *Id.* at 66–67, 96 S.Ct. at 657–658. As Goland points out, no one who had heard the message of Ed Vallen could possibly have failed to know where to place him in the political spectrum. However, the informational interest simply is not that narrow. There is valuable information to be gained by knowing that Vallen took $120,000 from a Cranston supporter aside from being able to locate Vallen ideologically or to predict to whom he may be beholden. A conservative voter deciding between Vallen and Zschau very likely may have viewed Vallen in a different light with that knowledge.

Rather than impinging on first amendment values, the disclosure requirement may actually *further* them, even in the circumstances of this case. As we observed in *FEC v. Furgatch,* 807 F.2d 857, 862 (9th Cir.1987):

The vision of a free and open market place of ideas is based on the assumption that the people should be exposed to speech on all sides, so that they may freely evaluate and choose from among competing points of view. One goal of the First Amendment, then, is to ensure that the individual citizen has available all the information necessary to allow him to properly evaluate speech.... The allowance of free expression loses considerable value if expression is only partial. Therefore, disclosure requirements, which may at times inhibit the free speech that is so dearly protected by the First Amendment, are indispensable to the proper and effective exercise of First Amendment rights.

The third purpose behind the disclosure and record-keeping provisions is to gather the data necessary to detect violations of the contribution limits. *Buckley,* 424 U.S. at 67–68, 96 S.Ct. at 657–58. Adopting the position advocated by Goland would create a loophole so large all could pass through. To avoid the contribution limit, one need only make an anonymous donation, wait for the election, and then reveal one's identity. As the Commission also points out, if the candidate as well as the Commission and the public are ignorant of the identity of a large contributor, there would be no way to determine that the contributor is actually an individual as opposed to a corporation or labor union, a public contractor, a representative of a foreign government or a member of a foreign cartel (None may make contributions under FECA. *See* 2 U.S.C. § 441b, 441c(a), 441e(a)).[22]

III. *Additional Challenges to Certification.*

■ The United States contends that aside from being frivolous, Goland's constitutional questions should not be certified to the en banc court because they arise in the course of a criminal prosecution.[23] This

---

**22.** *See, CALMED,* 453 U.S. 182, 197–99, 101 S.Ct. 2712, 2722–23, *Gifford v. Congress,* 452 F.Supp. 802, 805, n. 7 (1978) (describing creative ways to evade FECA limits).

**23.** The Government also claims that Goland's constitutional questions should not be certified because they incorporate a challenge to 18 U.S.C. 1001. The legislative record of FECA

argument has no merit; the Supreme Court has held explicitly that the same constitutional issues could be raised by the same parties in both a declaratory judgment action and an ongoing enforcement proceeding. *CALMED*, 453 U.S. 182, 101 S.Ct. 2712.

■ The Commission also urges that the certification provision should apply only to facial and not to "as applied" challenges. The Ninth Circuit explicitly rejected this limitation in its decision in *California Medical Ass'n v. FEC*, 641 F.2d 619, 632 (1980). "The suggestion ... to limit en banc hearings to cases presenting issues of 'facial' validity ... does not avoid difficult constitutional questions, and it may compound them.... The distinction between facial issues and other issues ... is an unstable juridical category. The difficulties it presents are sufficiently metaphysical that the occasions to draw such fine lines should not be multiplied beyond necessity."

## CONCLUSION

Goland complains that there was no alternative available that would have permitted him to execute his political strategy and remain within the FECA strictures. He may be correct. However, it is exactly this style of politics that Congress outlawed when it amended FECA in 1974. And the Court just as clearly gave its constitutional blessing to the challenged provisions in *Buckley*. The District Court's refusal to certify to an en banc panel and its dismissal of the complaint is AFFIRMED.

TANG, Circuit Judge, dissenting:

I agree in the main with the opinion's analysis. I write separately, however, to highlight the needlessly burdensome consequences of 2 U.S.C. § 437h mandating initial en banc hearing of constitutional challenges to FECA. In order to avoid those needlessly burdensome consequences, we

split too fine a hair in this case. On the one hand, the court holds Goland's constitutional challenge is too "frivolous" for en banc rehearing under § 437h, but on the other, it is not "frivolous" enough to warrant sanctions. This subtle distinction permits us to decide Goland's constitutional challenge on the merits without conceding that the challenge indeed presents some, albeit unavailing, meritorious arguments.

If Goland's constitutional challenge raises any meritorious arguments, then, as Congress has required under § 437h, we should reverse dismissal and certify the challenge to the en banc court. We avoid that needlessly wasteful process in Goland's case, but not without some cost. In this decision the court has added another step to FECA jurisdictional analysis with its subtle distinctions in what is frivolous. It is a step unfortunately prone to result-oriented decision making.

suggests that the government's objection is unsound. The Joint Explanatory Statement of the Committee on Conference stated that the conference substitute clarifies that "these special judicial review provisions are available only for actions directed at determining the constitutionality of provisions of the Act and of provisions of Title 18, United States Code, related to the activities regulated by the Act." 1974 U.S.Code Cong. & Admin.News, 5664.